IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO


ROSA MARTINEZ,

       Plaintiff,

v.                                                                                             CV 12-1259 WPL

CAROLYN W. COLVIN, *Acting Commissioner of the Social Security Administration*,

       Defendant.


**MEMORANDUM OPINION AND ORDER**

      Rosa Martinez filed applications for Disability Insurance Benefits and Supplemental Security Income on June 18, 2009. (Administrative Record ("AR") 9.) She alleges disability beginning on May 30, 2009, due to back and bladder problems, fibromyalgia, migraine headaches, depression, and anxiety. (AR 34-35, 40, 43-44, 211.) Administrative Law Judge ("ALJ") Ralph Shilling held a disability hearing on November 9, 2010. (AR 30-64.) On May 12, 2011, ALJ Frederick E. Upshall, Jr.[1] determined that Martinez was not under a disability as defined by the Social Security Act and was therefore not entitled to benefits. (AR 9-23.) Martinez filed an appeal with the Appeals Council, but the Council declined her request, making the ALJ's decision the final decision of the Social Security Administration ("SSA"). (AR 1-5.)

      Martinez sought review of the SSA's decision (Doc. 1) and filed an opposed Motion to Remand to Agency for Rehearing (Doc. 15). The Commissioner of the SSA ("Commissioner") responded (Doc. 16), and Martinez filed a reply (Doc. 17). After having read and carefully

---

      [1] While Upshall wrote in his decision that "I held a video hearing" (AR 9), I assume that statement is an error.

considered the entire record and the relevant law, I grant Martinez's motion and remand this case to the SSA for proceedings consistent with this opinion.

## STANDARD OF REVIEW

In reviewing the ALJ's decision, I must determine whether it is supported by substantial evidence in the record and whether the correct legal standards were applied. *See Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (citation omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009) (quoting *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007)). A decision is not based on substantial evidence if other evidence in the record overwhelms it or if there is only a scintilla of evidence supporting it. *Hamlin*, 365 F.3d at 1214 (quotation omitted). However, substantial evidence does not require a preponderance of evidence. *U.S. Cellular Tel. of Greater Tulsa, L.L.C. v. City of Broken Arrow, Okla.*, 340 F.3d 1122, 1133 (10th Cir. 2003). I must meticulously examine the record, but I may neither reweigh the evidence nor substitute my discretion for that of the Commissioner. *See Hamlin*, 365 F.3d at 1214 (quotation omitted). I may reverse and remand if the ALJ has failed "to apply the correct legal standards, or to show us that []he has done so." *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996).

## SEQUENTIAL EVALUATION PROCESS

The SSA has devised a five-step sequential evaluation process to determine disability. *See Barnhart v. Thomas*, 540 U.S. 20, 24 (2003); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). At the first three steps, the ALJ considers the claimant's current work activity, the medical severity of the claimant's impairments, and the requirements of the Listing of Impairments. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4), & Pt. 404, Subpt. P, App'x 1. If a claimant's impairments are

not equal to those in the Listing of Impairments, then, before reaching step four, the ALJ determines the claimant's residual functional capacity ("RFC"). *See* 20 C.F.R. §§ 404.1520(e), 416.920(e). In the fourth step, the ALJ compares the claimant's RFC with the functional requirements of his past relevant work to see if the claimant is still capable of performing his past work. *See* 20 C.F.R. §§ 404.1520(f), 416.920(f). If a claimant is not prevented from performing his past work, then he is not disabled. *Id.* If the claimant cannot return to his past work, then the Commissioner must show at the fifth step that the claimant is capable of performing other jobs existing in significant numbers in the national economy. *See Thomas*, 540 U.S. at 24-25; *see also Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988) (discussing the five-step sequential evaluation process in detail). The claimant bears the burden of proof on the question of disability for the first four steps, and then the burden of proof shifts to the Commissioner at step five. *See Bowen v. Yuckert*, 482 U.S. 137, 146 (1987); *Talbot v. Heckler*, 814 F.2d 1456, 1460 (10th Cir. 1987).

## FACTUAL BACKGROUND

Martinez is a thirty-two year old woman with a GED. (AR 36.) She has worked as a child-care provider, cashier, home healthcare provider, and waitress and was last self-employed as a child-care provider in her home from 2000 to May 2009 (AR 36-37, 212.) Martinez discontinued work on May 30, 2009, her alleged disability onset date, due to medical problems. (AR 38.)

Martinez says that she was first diagnosed with migraine headaches at the age of nine. (AR 49.) Martinez also states that at some time in 2005 or 2006, she was in a four-wheeler accident, landing hard on her tailbone and purportedly causing her chronic pain. (*See* AR 296, 472, 595.) The medical records provided in the AR relating to her alleged conditions date back to

April 7, 2006. (*See* AR 286.) On that date, treating physician W. Murray Ryan, M.D., Martinez's primary care provider, ordered a CT scan of Martinez's lumbar spine. (*See id.*) The radiologist who examined the scan made "[v]ery mild findings at L4-5 with some bulging of the annulus and some minimal soft tissue spinal stenosis." (AR 286.) He noted further that these findings were of questionable significance. (*Id.*) On November 16, 2006, Dr. Ryan ordered an MRI of Martinez's lumbar spine. (AR 285.) The MRI showed no evidence of discogenic disease, spinal canal stenosis or neural foraminal encroachment, intrinsic cord or canda equine lesions, or herniations or other extrinsic masses impinging on the thecal sac. (*Id.*) There was evidence of degenerative changes at the lowermost zygapophyseal joints with a small synovial cyst on the left L5-S1. (*Id.*)

Martinez was treated in 2006 and 2007 by urologist Stephen Lucero, M.D. She complained that she frequently needed to urinate, and this made her back and legs hurt. (AR 247.) She also stated that these symptoms had been occurring for about a year. (*Id.*) After Martinez's final visit with Dr. Lucero on July 12, 2007, Lucero wrote that Martinez experienced chronic pelvic pain, recurrent urinary tract infections, persistent hematuria, urgency, frequency, urinary retention, back and leg pain, varicosities in the legs, a history of migraine headaches, feeling tired and sluggish, and depression. (AR 250.) Her medications at that time included Paxil, Valium, and Lortab. (*Id.*)

In 2008, Martinez gave birth to a child. (AR 369-71.) During the pregnancy, her musculoskeletal problems worsened. (AR 363.) Post-pregnancy, Martinez expressed to her gynecologist, Claudia Mason, M.D., that she was experiencing increased depression and fleeting suicidal thoughts. (AR 358.) Dr. Mason increased her dosage of Paxil to mitigate her depression. (*Id.*)

Martinez visited Valley First Care on March 31, 2008, with anxiety and chest tightness. (AR 422.) Diane Johnson, M.D., increased her Paxil from 40 mg to 50 mg. (AR 423.) In April, Martinez described symptoms including back pain, depression, and body aches. (AR 424.) In May, she complained that she was encountering a lot of stress in her marriage and that she was very depressed. (AR 356.) Two months later, in July 2008, Martinez visited Valley First Care complaining of stomach pain, nausea, and fever. (AR 426.) In October, she described neck pain, stiffness, and depression. (AR 428.) By November 2008, Martinez was going through a divorce and had been homeless for three weeks. (AR 352.) She again visited Valley First Care for low-back pain on November 25, 2008, and was referred to Theresa Genovese-Elliott, M.D., at the Spine & Pain Institute. (AR 432.)

Martinez visited Dr. Genovese-Elliott on December 3, 2008, reporting back pain, particularly on the right side. (AR 458.) She denied any symptoms in her leg such as weakness, numbness or tingling. (*Id.*) Dr. Genovese-Elliot found minimal disc bulge at L4-5 in a CT scan. (*Id.*) Martinez's back was limited in flexion to about twenty degrees due to low-back pain. (*Id.*) Martinez's motor exam revealed 5/5 and symmetric strength with normal tone and bulk. (*Id.*) Dr. Genovese-Elliot's impression was mechanical back pain, probably facet mediated. (*Id.*) She also noted that Martinez's previous MRI from 2006 demonstrated facet arthropathy only at L4-5 and L5-S1 without significant disc protrusions. (*Id.*) Dr. Genovese-Elliot discussed treatment options with Martinez, who decided to try steroid facet joint injections. (*Id.*)

On December 15, 2008, Martinez reported to Dr. Ryan that she was beaten by her estranged husband, who was taken to jail. (AR 278; *see* AR 434-35.) Dr. Ryan renewed a prescription for Lorcet to treat her back pain and prescribed Prilosec for epigastric pain. (AR

278.) By the end of the month, Martinez claimed that she was getting her life back together and feeling happy about what was going on at that time. (AR 277.)

On January 30, 2009, Martinez informed Dr. Ryan that her back pain was improving through working with Dr. Genovese-Elliot but that she was still getting bad anxiety on occasion. (AR 276.) However, by March 2009, Dr. Ryan determined that Martinez was terminated from a pain clinic for noncompliance, and he declined to give her pain pills because he believed that she was drug-seeking. (AR 274.) Martinez asked, "What if I want another doctor"? (*Id.*) Although Martinez then suggested that she might see another doctor, she did permit Dr. Ryan to run blood tests and order x-rays and an MRI of her LS spine. (*Id.*) On April 14, Martinez returned to Dr. Ryan to review x-ray and MRI results, which Dr. Ryan characterized as "pretty normal." (AR 273.) He found mild facet changes in the lower lumbar spine, a small synovial cyst at L5-S1, mild bulging osteophytes at L4-5 with some thickening of the ligament, and mild loss of lumbar lordosis. (AR 283-84.)

After this visit with Dr. Ryan, Martinez went to see Dr. Raja Mirchandani, M.D., instead for a couple of months. (*See* AR 321-24.) She complained of low-back pain, depression, anxiety, weakness, and congestion. (*Id.*) Dr. Mirchandani adjusted her prescriptions and referred her to a pain clinic. (*Id.*)

In May 2009, Martinez went to the ER for lower abdominal pain, which she was told was caused by a miscarriage. (*See* AR 319.) On June 9, 2009, right tubal and cul-de-sac content specimens indicated that Martinez had a blood clot. (AR 330.) Also in May 2009, Martinez began treatment with Dr. Paul Fullerton, D.O., at Santa Fe Pain and Spine Specialists after Dr. Genovese-Elliott referred her there. (AR 296-97.) Martinez complained of pain over the right lower quadrant of her lumbar spine, which she stated began after the ATV accident, as well as

chills, fatigue, dizziness, constipation, joint pain and weakness, depression, and anxiety. (AR 296.) She reported her pain level as seven out of ten, with the pain increasing from bending, sitting, standing, walking, climbing stairs, reaching, exercise, coughing, and bowel movements. (AR 296-97.) Dr. Fullerton recommended that Martinez return for a sacroiliac joint injection to try to diagnose her medical problem. (AR 297.) The joint injection was unsuccessful, and Dr. Fullerton provided Martinez with an epidural steroid injection on July 20, 2009. (AR 498-99). In October 2009, Dr. Fullerton ordered a cervical MRI, from which osteophyte and disc complexes were found at C5-6. (AR 497.) Martinez reported migraine headaches and neck pain in December. (*Id.*) She visited Dr. Michael Baten, M.D., on December 8, 2009, who prescribed Topamax to treat her migraines. (AR 524.)

On October 1, 2009, Robert Krueger, Ph.D., conducted a consultative psychological evaluation of Martinez at the request of Disability Determination Services ("DDS"), including a Clinical Interview with Biopsychosocial History and Mental Status Examination, Beck Depression Inventory ("BDI"), and Digit Span Test ("DST"). (AR 472.) Martinez's primary concerns included chronic medical problems and emotional difficulties. (*Id.*) She scored a 39 on the BDI, "a highly elevated score, which suggests that she is experiencing significant problems with depression now." (AR 474.) On the DST, Martinez scored at the low-average level with respect to her immediate-recall memory skills. (*Id.*) After his full evaluation, Dr. Krueger found that Martinez

> can be expected to have mild impairment with understanding, remembering, and following simple work instructions and moderate impairment with complex or detailed instructions. Because of these same factors, she may have moderate impairment with maintaining pace and persistence, and moderate impairment with adjusting to changes in work environment. At the present time she can be expected to have mild to moderate impairment in relationships with coworkers, supervisors, and the general public. In her present situation, she can be expected to have moderate impairment with traveling to distant places alone. Because of

>   the ongoing medical problems and emotional difficulties, she may have mild to moderate impairment with being aware of and reacting appropriately to dangers in work environments. These appear to be relatively long-term problems, which can be expected to persist for more than one year.

(AR 475.) He diagnosed her with major depressive disorder, recurrent, severity unspecified and anxiety disorder not otherwise specified. (AR 474.) Dr. Krueger also assessed her with a global assessment of functioning ("GAF") score[2] of 55, indicating moderate problems with social, occupational, or school functioning. (*Id.*)

In 2010, Martinez continued to receive care from Dr. Ryan and Dr. Baten. On April 7, Dr. Ryan wrote that Martinez has had "the world's most horrendous issues over the last twenty-nine years." (AR 510.) In June, Martinez reported that she was getting migraines so severe once or twice a month that she had to go to the emergency room. (AR 523.) Dr. Baten prescribed Percocet and then Lortab in late July to mitigate the migraines. (AR 519, 520, 522.) As of August 25, 2010, the Lortab seemed to be "working pretty well" to control Martinez's migraines. (AR 517; *see* AR 516.)

Martinez also received treatment from Heather Sena, M.D., in 2010 for back pain, insomnia, depression, fatigue, elevated blood pressure, breast pain, hematuria, vaginal discharge, and constipation. (*See* AR 527-36, 542-47.) Dr. Sena recommended yoga or Pilates to strengthen Martinez's core and improve her posture. (AR 529.) Dr. Sena attempted to shift Martinez over to Cymbalta to treat her depression instead of Paxil, but Martinez became more depressed and suicidal, so Dr. Sena returned her to Paxil. (AR 534.) Dr. Sena also referred Martinez to a rheumatologist to determine whether she had fibromyalgia (AR 528) and prescribed a Transcutaneous Electric Nerve Stimulation unit as well as Lyrica. (AR 532.)

---

[2] A GAF score is a rating that reflects the individual's overall level psychological, social and occupational functioning. AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed. 2000).

Dr. Sena referred Martinez to the office of Fredrica Smith, M.D., in September 2010 for back pain, fatigue, myalgias, and arthralgias. (AR 595.) Chris Nelson, CFNP, ordered sacroiliac joint and thoracic spine x-rays as well as CBC, TSH, ESR, CRP, ANA, HLA-B27, and hepatitis B and C screenings. (AR 596.) Nelson also recommended that Martinez begin an exercise program. (AR 597.) Test results showed an elevated ESR and CRP. (AR 594.) During a follow-up visit at the end of October, Nelson found that Martinez was tender over the lumbar area of the spine and the SI joints, as well as surrounding low-back muscles. (*Id.*) She was assessed with chronic back pain and mild lumbosacral degenerative joint disease. (*Id.*)

In October 2010, Martinez also began counseling with Penny Davies, Ph.D., LPCC. (*See* AR 578-79.) Over the course of three visits, Martinez described problems with depression, anxiety, chronic pain, arthritis, and migraines. (AR 578.) She also discussed her difficult childhood and current problems at home. Martinez asserted that she had a lot of arthritic pain and "bad" migraines. (AR 579.)

## HEARING TESTIMONY

ALJ Shilling held a hearing on November 9, 2010, at which Martinez and Vocational Expert ("VE") Pamela Bowman testified. (AR 32.) At the hearing, Martinez was assisted by attorney Michelle Baca. (*Id.*, AR 34.) The ALJ sought to clarify the alleged disability onset date, which Baca asserted was May 30, 2009. (AR 34-35.) The ALJ questioned Martinez about her most recent employment, which she stated was as a self-employed child-care provider from 2000 until her alleged onset date. (AR 36-38.)

Martinez testified that she stopped working on May 30, 2009, because of "anxiety and depression, the pain in my back and my legs." (AR 38.) She also testified that she worked at Wal-Mart for a week or two in 2009 before her alleged onset date, and only for a couple of hours

a day. (AR 38-39.) Martinez stated that she had been seeing Nelson at Dr. Smith's office, and Nelson had diagnosed her with fibromyalgia. (AR 39-40.) Baca then questioned Martinez about her symptoms. (AR 41.) Martinez explained that she had a lot of pain in the form of a burning sensation in her lower back and that her legs hurt and tended to lock up. (*Id.*) She said that the pain in her back is constant, while the pain spreads to her legs about twice a day, regardless of the position she is in. (AR 41-42.) Martinez claimed that it takes her a while to get out of bed, and it is difficult for her to sleep at night. (AR 41.) However, she stated that Trazodone helps her sleep. (AR 42.)

Martinez also alleged that she was getting migraines at least every other day. (AR 43.) She stated that when she gets a migraine, she has to take her Lortab medication and go to a quiet room where there is no noise, light, or sound. (AR 43.) Martinez stated that the headache can last throughout a day. (AR 44.)

In discussing her problems with depression and anxiety, Martinez explained that it is hard for her to "stay focused on certain things," and she went on to describe her difficult childhood and the sudden death of her second daughter at the age of one and a half months. (AR 45.) Martinez also stated that she takes Paxil for her depression, but she needs to talk with her doctor about trying a stronger medicine. (AR 46.) She said that she gets panic attacks on occasion. (*Id.*) Martinez also claimed that she feels like people are judging her, she gets anxious, and she cannot keep a steady, long-term job. (AR 47.) She stated that she did not think that she could be there emotionally for her children, let alone other people's children. (*Id.*) She lies in bed as much as possible due to the back pain and has to take a nap sometime during the day. (*Id.*) Martinez stated that she was also receiving counseling from Penny Davies and had seen her three times. (AR 62.)

The ALJ then questioned Martinez, highlighting her neurologist's comments that "she has one or two really bad [migraines] a month and going on a fairly regular basis, maybe once a month, sometimes twice to the emergency room." (AR 49-50.) The ALJ asked Martinez to clarify whether these headaches mentioned by the neurologist were different than the ones she stated occurred about every other day, forcing her to go into a quiet room (*Id.*) Martinez confirmed that she was still getting these migraines about every other day and that she did not like going to the emergency room, but when the pain was excruciating enough, she would go there. (AR 50.) The ALJ asked how Martinez was able to run her child-care business if she had migraines during the day. (*Id.*) She claimed that she took care of children during the day and evenings, and her migraines usually occurred during the evening at the end of a long day, after her husband was already home and could help with the children. (*Id.*)

The ALJ then asked her whether she was buying street pills at this time; Martinez said no. (*Id.*) He also inquired about Martinez's need to take naps, and she clarified that she needs to take an hour to an hour and a half nap once each day. (AR 53.)

After the ALJ completed his questioning, Baca made a few comments. She stated that while Martinez's migraines had improved for a time, they returned worse about three months before and were "pretty much constant." (*Id.*)

The ALJ then asked the VE several hypotheticals. (AR 54-62.) The VE responded that a person subject to the limitations in the ALJ's hypotheticals could not perform any of Martinez's past relevant work but could serve as a mail clerk/sorter, shipping and receiving weigher (AR 57-58), mail filer, or jewelry sorter (AR 59), depending on the various iterations of the ALJ's hypotheticals.

The ALJ further asked the VE to assume a person subject to the hypothetical limitations posed previously also needed one to one and a half hours of rest during the day. (AR 58-60.) The VE replied that this would constitute excessive time off task, and such a person would not be able to maintain the jobs she had listed. (*Id.*) The VE also stated that someone who missed work two times per month could not maintain any of the jobs discussed in the previous hypotheticals. (*Id.*)

## ALJ UPSHALL'S DECISION

ALJ Upshall reviewed Martinez's claim pursuant to the five-step sequential evaluation process. At the first step, the ALJ found that Martinez had not engaged in substantial gainful activity since her alleged onset date of May 30, 2009. (AR 11.) Then, at the second step, the ALJ concluded that she suffers from the severe impairments of migraines, low back pain, and depression/anxiety. (*Id.*) At step three, the ALJ found that Martinez's combination of severe impairments did not meet or medically equal one of the listed impairments. (AR 12.)

The ALJ then reviewed the medical evidence and determined that Martinez had the RFC to perform a limited range of sedentary work, including occasional climbing of stairs or ramps, stooping, crouching, kneeling and crawling, and never climbing ladders, ropes or scaffolds. (AR 14.) Furthermore, Martinez had to avoid bright lights and excessive noise and be limited to work involving one or two step tasks, only occasional simple decision-making, occasional changes in the work setting, and only occasional interaction with the public, incidental to the work performed. (*Id.*) The ALJ stated that he found Martinez's statements regarding the intensity, persistence, and limiting effects of her conditions not credible to the extent that they were inconsistent with the RFC. (AR 15.) He also noted twice, without analysis, Dr. Krueger's opinion regarding moderate limitations in maintaining pace and persistence. (*See* AR 17, 20.)

The ALJ concluded as part of step four that Martinez could not perform her past relevant work. (AR 21.) He considered Martinez's age, education, work experience, and RFC and concluded that, based on the testimony of the VE, Martinez could perform the work of mail filer or jewelry sorter. (AR 22.) The ALJ noted that while hypotheticals involving one to one and a half hour rest periods during the work day or two days of absences per month were posed to the VE, he did not find these limitations reasonable or valid because there was no medical or other evidence to support the existence of such limitations. (AR 23.) Accordingly, the ALJ concluded that Martinez was not eligible for benefits. (*Id.*)

## DISCUSSION

Martinez argues that the ALJ's decision contains two errors. First, she challenges the ALJ's mental RFC determination, arguing that the ALJ improperly omitted Martinez's impaired persistence and pace. (Doc. 15 at 4, 14.) Second, Martinez asserts that the ALJ's adoption of the VE testimony was error for two reasons: A) The ALJ did not present a complete RFC to the VE, and B) the VE's testimony regarding the number of jobs available was contrary to law and reason. (*Id.* at 4, 17, 19.) Because I find Martinez's mental-RFC-determination argument meritorious, I will not consider the subsequent argument.

In formulating a claimant's RFC, the ALJ must consider and evaluate every medical opinion in the record, including the medical opinions of state agency examiners. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c). The ALJ is not bound by the opinions of state examiners, but he or she "may not ignore these opinions and must explain the weight given to the opinions in their decisions." SSR 96-6p, *2, 1996 WL 374180 (1996).[3] Although an ALJ is the ultimate arbiter of

---

[3] SSRs are binding on the SSA, and while they do not have the force of law, courts traditionally defer to SSRs since they constitute the agency's interpretation of its own regulations and foundational statutes. *See* 20 C.F.R. § 402.35; *Sullivan v. Zebley*, 493 U.S. 521, 531 n.9

a claimant's RFC, if the record contains an RFC assessment from a state agency medical or psychological consultant, then the ALJ must consider that evaluation using the rubric for the consideration of opinion evidence from non-examining sources. *Id.* at *4. The rubric directs ALJs to assess the supportability or weight of the opinion by objective medical findings, consistency with the record as a whole, the specialization of the examiner, and other factors. *See* 20 C.F.R. §§ 404.1527(e), 416.927(e).

With these legal requirements in mind, I turn to Martinez's arguments with respect to her allegation that the ALJ erred in his mental RFC determination. She first states that the ALJ erred in not accounting for Dr. Krueger's finding of moderate impairments in Martinez's ability to maintain persistence and pace. (Doc. 15 at 14.) Martinez supports her allegation that there was an omission in the RFC by highlighting that the RFC limited her to "work involving one or two step tasks," but that such a description does not "take into account a finding that the claimant often suffered from deficiencies in concentration, persistence, or pace." (*Id.* at 15 (citing *Chavez v. Astrue*, No. 08-cv-1103 WPL, Doc. 30 (D.N.M. Jan. 5, 2010))). Further, Martinez argues that had the ALJ taken into account the findings of Dr. Krueger, the RFC would also have included other limitations, such as restrictions on interacting with supervisors, and being aware of, and reacting appropriately to dangers in the work environment. (*Id.*) Finally, Martinez argues that because Dr. Krueger's findings did not mirror the other evidence of record, "the ALJ was required to explain why he adopted some, but not all, of Dr. Krueger's findings." (*Id.* at 16 (citing SSR 96-6p).)

In response, the Commissioner argues that Dr. Krueger's findings were ambiguous and that it was the duty of the ALJ to resolve that ambiguity. (Doc. 16 at 5.) The Commissioner also

---

(1990); *see also Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1051 (10th Cir. 1993) (SSRs entitled to deference).

cites to treating physicians in the record who never noted anything about difficulties in maintaining persistence or pace. (*See id.* at 6.) Further, the Commissioner points out that the ALJ found Martinez's subjective statements about her ability to work not credible. (*Id.*) Finally, the Commissioner argues that *Chavez* is distinguishable from this case because the former case involved an ALJ who did not consult a VE, whereas in this case, the ALJ did consult a VE. (*Id.* at 7.)

In her reply, Martinez argued first that the ALJ did not find Dr. Krueger's opinion to be ambiguous, and therefore the Commissioner cannot use this argument to support the ALJ's conclusions. (Doc. 17 at 1-2.) Second, Martinez argues that even if Dr. Krueger's opinion was ambiguous, the ALJ was required to resolve, rather than ignore, the ambiguities, and if the ALJ did simply ignore information he found ambiguous, remand would be required to further develop the record. (*Id.* at 2-3.) Martinez also argues that even though Dr. Krueger stated that Martinez "may" have difficulties with persistence and pace, his findings were consistent with the remainder of the record. (*Id.* at 3.)

I first address whether the RFC's limitation to "work involving one or two step tasks" took into account on its face impairments affecting persistence and pace. (*See* AR 14.) In *Chavez*, I found error in the ALJ's assumption that the claimant's difficulties in persistence and pace could be accounted for in the RFC by restricting him to work involving simple and routine tasks. 08-cv-1103 WPL, Doc. 30 at *17-18 (citing *Ramirez v. Barnhart*, 372 F.3d 546, 554 (3d Cir. 2004); *Newton v. Chater*, 92 F.3d 688, 694-95 (8th Cir. 1996); *Benton v. Comm'r of Soc. Sec.*, 511 F. Supp. 2d 842, 849 (E.D. Mich. 2007)); *see also Weigel v. Astrue*, 425 F. App'x 706, 710 (10th Cir. 2011) (unpublished) (finding that the ALJ erred in failing to explain in his RFC determination how claimant could perform simple tasks with adequate persistence and pace).

The Commissioner argues that *Chavez* is distinguishable from this case because in the former case, the ALJ did not consult a VE, whereas in this case, the ALJ did consult a VE. (Doc. 16 at 7.) In *Chavez*, I merely noted that rather than making his own assumptions about the types of jobs available to the claimant, the ALJ should have consulted a VE and included hypotheticals dealing with impairments affecting persistence and pace. *Chavez*, 08-cv-1103 WPL, Doc. 30 at *18. The lack of a VE in *Chavez* did not affect the formulation of the RFC. Here, as in *Chavez*, the RFC's limitation to simple tasks therefore does not on its face take into account potential limitations in persistence and pace.

Next, I address whether the ALJ treated Dr. Krueger's opinion regarding moderate limitations in persistence and pace as ambiguous. The ALJ noted Dr. Krueger's opinion with regard to persistence and pace twice in his discussion of the RFC, each in a slightly different manner. First, he noted that "[b]ecause of [chronic pain, limited movement, and ongoing depression], [Dr. Krueger] stated that she may have a moderate impairment with maintaining pace and persistence." (AR 17.) Later, the ALJ recognized that "[i]t was the opinion of Dr. Robert Krueger that although the claimant had a mild impairment with understanding, remembering and following simple work instructions, she had moderate limitations in maintaining pace and persistence and moderate impairment with adjusting to changes in a work environment." (AR 20.) While the first statement includes the uncertain word "may," the second statement does not. I therefore look further at the context of the opinion to determine whether the ALJ treated Dr. Krueger's opinion on persistence and pace as ambiguous.

When a medical opinion is ambiguous such that the ALJ cannot determine whether the claimant is disabled, the ALJ has a duty to "recontact medical sources to supplement or clarify" the evidence. *Maes v. Astrue*, 522 F.3d 1093, 1097 (10th Cir. 2008) (citing 20 C.F.R. §

404.1512(e)). Furthermore, "when the ALJ considers an issue that is apparent from the record, he has a duty of inquiry and factual development with respect to that issue." *Id.* (citing *Grogan v. Barnhart*, 399 F.3d 1257, 1263-64 (10th Cir. 2005)). In *Maes*, the ALJ noted that the claimant was prescribed medication that is used to treat depression, but because the record did not include a specific diagnosis of depression, the ALJ found that the claimant was not disabled. *Id.* at 1098. The court found that the ALJ should have contacted the medical sources to clarify the claimant's alleged mental impairment. *Id.* at 1097. In *Grogan*, the court found that even though the claimant had not asserted in his disability application that he suffered from a mental impairment, because the ALJ found the issue apparent from the record and chose to address it, the ALJ had the burden to develop the record. *Grogan*, 399 F.3d at 1264 (citing *Henrie v. United States Dep't of Health & Human Servs.*, 13 F.3d 359, 360-61 (10th Cir. 1993)). Thus, if the ALJ found ambiguity in a medical opinion, he had a duty to recontact the relevant medical source for clarification. There is no indication in the record that the ALJ recontacted Dr. Krueger for clarification. (*See* AR 9-23.) Because a deeper contextual analysis fails to demonstrate that the ALJ found Dr. Krueger's opinion to be ambiguous, I do not find cause to remand for further development of the record. Rather, I proceed with the next argument based on the assumption that the ALJ found no ambiguity in Dr. Krueger's opinion.

Martinez claims that the ALJ erred in not accounting for Dr. Krueger's finding of moderate impairments in her ability to maintain persistence and pace. (Doc. 15 at 14.) The standard an ALJ must follow for weighing the opinion of a state consulting psychologist is well-known:

> Because State agency medical and psychological consultants and other program physicians and psychologists are experts in the Social Security disability programs, the rules in 20 CFR 404.1527(f) and 416.927(f) require administrative law judges and the Appeals Council to consider their findings of fact about the

17

> nature and severity of an individual's impairment(s) as opinions of nonexamining physicians and psychologists. Administrative law judges and the Appeals Council are not bound by findings made by State agency or other program physicians and psychologists, but they may not ignore these opinions and must explain the weight given to the opinions in their decisions.

SSR 96-6P at *2. In a case similar to this one, a court remanded the case because the ALJ failed to explain why his determination of mental RFC did not include certain mental limitations found by a non-examining psychologist. *Simmons v. Barnhart*, 327 F. Supp. 2d 1308, 1315 (D. Kan. 2004). The court found that "[t]he ALJ must assess all of the psychologists' opinions, discuss the reasons for the weight given to each, and state his specific findings regarding plaintiff's degree of limitation in each of the four functional areas." *Id.* (citing *Robinson v. Barnhart*, 366 F.3d 1078, 1082 (10th Cir. 2004); 20 C.F.R §§ 404.1520a, 416.920a; SSR 96-2P, 1996 WL 374188). On remand, the court instructed that the ALJ "specifically address the limitations in the psychologist's report, specifically state his findings regarding each of the four functional areas, and determine plaintiff's resulting RFC." *Id.*

In this case, it appears that the ALJ adopted some of the mental limitations suggested by Dr. Krueger, but not others, and he did so without explanation. For example, Dr. Krueger wrote that "Martinez can be expected to have mild impairment with understanding, remembering, and following simple work instructions and moderate impairment with complex or detailed instructions. Because of these same factors, she may have moderate impairment with maintaining pace and persistence, and moderate impairment with adjusting to changes in work environment." (AR 475.) However, the RFC only provides limitations as to "work involving one or two step tasks, involving only occasional decision making, occasional changes in the work setting, and with only occasionally [sic] interaction with the public." (AR 14.) Similarly, in *Frantz* and *Haga*, the respective ALJs adopted some mental limitations in their RFCs but omitted others without

explanation. *Frantz v. Astrue*, 509 F.3d 1299, 1302-03 (10th Cir. 2007); *Haga v. Astrue*, 482 F.3d 1205, 1208 (10th Cir. 2007). The Tenth Circuit remanded both cases to allow the ALJ to address the inconsistency and explain the evidentiary support for the RFC assessment. *Frantz*, 509 F.3d at 1302-03; *Haga*, 482 F.3d at 1208.

Upon review of the ALJ's decision, I find that the ALJ failed to provide any explanation as to the weight given to Dr. Krueger's opinion and that he failed to explain why he adopted in his RFC some of the mental limitations outlined in Dr. Krueger's opinion but did not adopt any limitations regarding persistence and pace. (AR 9-23.) These failures constitute a basis for remand.

## CONCLUSION

The ALJ erred by failing to explain the weight he accorded Dr. Krueger's opinion and why he adopted some mental limitations in his RFC but not limitations relating to persistence and pace. Because the ALJ did not discuss the weight rendered to Dr. Krueger's opinion or his reasoning for not including limitations in persistence and pace, the ALJ may have erred in omitting persistence and pace as a mental limitation. I grant the motion to remand with the express instruction that the ALJ describe the weight he accorded Dr. Krueger's opinion and either include limitations in persistence and pace in the RFC or explain why such limitations should be omitted from the RFC.

IT IS SO ORDERED.

_____
William P. Lynch
United States Magistrate Judge